# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs January 25, 2011

## JAMES DUBOSE v. JIM WORTHINGTON, WARDEN

**Appeal from the Circuit Court for Morgan County**
**No. 9257      E. Eugene Eblen, Judge**

**No. E2010-01328-CCA-R3-HC - Filed May 16, 2011**

The Petitioner, James DuBose, appeals the Morgan County Circuit Court's dismissal of his petition for habeas corpus relief from his 1993 conviction for first degree murder by aggravated child abuse. He claims his judgment of conviction is void because the indictment was invalid and charged him with violating a statute that did not exist at the time of his offense. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Joe H. Walker, District Public Defender, and Walter B. Johnson, II, Assistant District Public Defender, for the appellant, James DuBose.

Robert E. Cooper, Jr., Attorney General and Reporter, and John H. Bledsoe, Senior Counsel, for the appellee, Jim Worthington.

## OPINION

The facts of this case were summarized by our supreme court as follows:

> The victim was 16-month-old Rufus Jones, Jr., whose death was caused by the application of significant force, consistent with a blow with a fist to his abdomen, which had developed massive internal scarring as the result of older, undiagnosed injuries. The victim was pronounced dead at the hospital emergency room at approximately 9 p.m. on July 3, 1993, where he was taken by his mother, Ann Jones, and the

defendant. Jones and the defendant were living together in a mobile home with her children: Rufus, the victim; Nick, age 10; and Joey, age 6. The defendant's son, Jamie, age 4, also lived with them.

The conviction is based on circumstantial evidence. On the date of the victim's death, the defendant went to work and Jones and the children spent the morning with a friend and her small child. After the defendant returned home from work, he, Jones, and all the children visited in the home of the defendant's parents until late afternoon, when they all, except Jamie, returned to the mobile home. They remained together until some time later when Jones left to get pizza and a movie video. When she left, the victim was sitting at the kitchen table eating a hot dog. According to Jones, the victim had appeared to be well in the morning but somewhat "lazy" later in the day. However, there was no evidence that he sustained any injury during the day.

Nick testified that after his mother left to get the pizza and movie, the victim fell asleep at the kitchen table and was carried by the defendant to the bedroom. Nick stated that while the defendant and the victim were in the bedroom he heard a noise, which the defendant explained to Nick was made by some toys falling.

When Jones returned, the defendant told her that he had put the victim to bed. She went into the bedroom and saw him lying on a blanket on the floor. She assumed the child was asleep. Later, the defendant went into the bedroom and returned carrying the victim. He told Jones the child was not breathing. The victim vomited when his mother gave him mouth to mouth resuscitation; otherwise, he exhibited no sign of life.

At the hospital, the defendant stated that he found the child pinned between the bed and the wall. His explanation was that the victim had dropped his bottle behind the bed and had been trying to retrieve it. The detective who investigated the death visited the home that night. He made numerous photographs and measured the distance between the bed and the

wall. When the detective returned the next day, he found under the bed a baby's bottle which had not been there the previous night. The detective also noticed that the bed had been moved a few inches farther away from the wall. Lastly, the detective discovered a rolled up blanket which the mother identified as the blanket on which the victim had been lying on the night he died. The blanket was damp in one spot with what appeared to be blood and mucus. The stain on the blanket was consistent with a sample of blood taken from the victim.

The medical examiner, Dr. Julia Goodin, performed the autopsy. She testified that the victim's abdominal cavity was full of blood, there were contusions on the intestines, and lacerations or tearing on the connective tissue to the small intestines, which likely were caused by a knuckle on the perpetrator's fist. The injury which caused the tearing probably had occurred within 24 hours of death and certainly had occurred within 36 hours of death. Exterior bruises on the victim corresponded to the internal abdominal injuries. The bruises were consistent with blows to the abdomen with a fist. According to Dr. Goodin, this type of blow typically is administered by an adult, not another child. In Dr. Goodin's opinion, the defendant's explanation of what happened was inconsistent with the injuries she observed. She testified that there was no indication that the child had been pinned in any way, nor were there signs of asphyxiation.

Dr. Goodin also testified that there was evidence of other internal injuries in the abdominal area which were at least a week old and could have been several months old. She stated that the old injuries had been caused by significant force and had resulted in internal scarring. Her conclusion was that the mass of scarring caused by the old injuries prevented the soft connective tissue from moving freely in the abdominal cavity when force was applied, thereby resulting in the tearing which caused the child to bleed to death. In addition, Dr. Goodin testified that on various parts of the body there were exterior contusions and bruises, some of which were as much as a week old. She also found evidence of prior contusions to the back of the scalp area which had resulted in the development of scar

tissue between the scalp and the skull. The medical examiner did not associate the injuries to the victim's head with his death.

In addition to the injuries found by the medical examiner, proof was introduced concerning an incident in March 1993 when the victim's fingers were injured while he was with the defendant; the defendant told Jones that the victim had smashed his fingers in the cabinet door. Because the defendant had taken the child to his sister's house, the mother did not see the fingers until later the next day. Two of the victim's fingernails were missing and there was pus on the fingers. She immediately took the victim to the emergency room where he was treated by Dr. Woodrow Wilson. Dr. Wilson concluded that the injuries were inconsistent with the fingers being accidentally smashed in a cabinet door, although it was possible that the victim could have sustained the injury by placing his fingers in the hinged door of the cabinet and then pulling his fingers while pushing against the cabinet door. He described the injury as a "superficial degloving," in which the skin is peeled off and there are no fractures. He suspected child abuse and discussed his concerns with the mother.

Harvey Wood, the mother's brother-in-law and also the defendant's uncle, testified that the defendant showed hostility toward the victim. Wood explained that the defendant disliked the victim's father, Rufus Jones, Sr. The defendant had told Wood that the victim "looked just like his daddy, sounded like his daddy, cried like his daddy and that he couldn't stand that little bastard either." Wood testified that on one occasion he had seen the defendant strike the victim on the head. Wood also stated that the defendant had tried to get him to change his testimony.

The defendant's basic defense was that there was not sufficient admissible evidence to prove the charge. The defendant initially claimed that the child's death was accidental—that it was caused by his becoming caught between the bed and the wall. At trial, he insisted that there was no evidence showing the cause of the fatal injury, that the evidence showed the injury could have been caused accidentally by the

children at play or intentionally by persons other than the defendant.

State v. DuBose, 953 S.W.2d 649, 650-51 (Tenn. 1997) (Dubose I). The Petitioner was convicted by a Williamson County Circuit Court jury of first degree murder by aggravated child abuse and sentenced to life imprisonment. His conviction was affirmed on direct appeal. Id., 953 S.W.2d at 655.

The Petitioner's petition for post-conviction relief was denied by the trial court and affirmed by this court. See James Dubose v. State, No. M2000-00478-CCA-R3-CD, Williamson County (Tenn. Crim. App. Feb. 1, 2001) (Dubose II), app. denied (Tenn. Oct. 1, 2001). The Petitioner previously filed two petitions for writ of habeas corpus, both of which were denied by the trial court and affirmed by this court. See James Dubose v. Tony Parker, Warden, No. W2005-01320-CCA-R3-HC, Lake County (Tenn. Crim. App. Dec. 9, 2005) (Dubose IV), app. denied (Tenn. Aug. 21, 2006); James Dubose v. State, No. M2004-01021-CCA-R3-HC, Wayne County (Tenn. Crim. App. Oct. 15, 2004), app. denied (Tenn. Feb. 28, 2005) (Dubose III).

On September 27, 2006, the Petitioner filed a petition for writ of habeas corpus alleging that his judgment of conviction was void because (1) the indictment was invalid and charged him with violating a statute that did not exist at the time of his offense; (2) Tennessee Code Annotated section 39-13-202(a)(4) was not published at the time of his offense or the victim's death; and (3) the indictment failed to state that his offense occurred after the effective date of the statute. The trial court found that the petition was "not well-taken" and dismissed the petition.

On appeal, the Petitioner contends only that his judgment of conviction is void because the indictment was invalid and charged him with violating a statute that did not exist at the time of his offense. The State contends that the trial court did not err by dismissing the petition because the Petitioner did not present a cognizable claim for habeas relief and did not establish that his conviction was void. We hold that the trial court did not err by dismissing the petition.

In Tennessee, habeas corpus relief is available only when it appears on the face of the judgment or the record that the trial court was without jurisdiction to convict or sentence the defendant or that his sentence has expired. Archer v. State, 851 S.W.2d 157, 164 (Tenn. 1993). The purpose of the habeas corpus petition is to contest a void, not merely a voidable, judgment. State ex rel. Newsom v. Henderson, 424 S.W.2d 186, 189 (1969). A void, as opposed to a voidable, judgment is "one that is facially invalid because the court did not have the statutory authority to render such judgment." Summers v. State, 212 S.W.3d 251, 256

(Tenn. 2007). A voidable judgment "is one that is facially valid and requires proof beyond the face of the record or judgment to establish its invalidity." Id. at 255-56. The burden is on the petitioner to establish that the judgment is void or that the sentence has expired. State ex rel. Kuntz v. Bomar, 381 S.W.2d 290, 291-92 (1964). The trial court may summarily dismiss a petition for writ of habeas corpus relief when the petitioner does not state a cognizable claim. Hickman v. State, 153 S.W.3d 16, 20 (Tenn. 2004).

We note that this court previously determined that the indictment stated a valid offense and met the constitutional and statutory requirements to vest jurisdiction in the trial court. See Dubose IV, slip op. at 8-9. Furthermore, the indictment stated that "on the 3rd day of July, 1993," the Petitioner caused the death of a child less than thirteen years of age. The statute the Petitioner was charged with violating, Tennessee Code Annotated section 39-13-202(a)(4), became effective on July 1, 1993, before the date listed in the indictment. See T.C.A. § 39-13-202(a)(4) (1993) (amended 1994, 1995, 1998, 2002, 2007).

The Petitioner argues that he was charged with violating a statute that did not exist at the time of his offense because the date of the abuse that caused the victim's death is unknown and the State alleged in its bill of particulars that abuse occurred from January 1993 through July 1993. This is, in essence, an allegation that the evidence did not establish that his offense occurred after the first degree murder statute became effective on July 1, 1993. A challenge to the sufficiency of the evidence is not a cognizable claim for habeas corpus relief. See Gant v. State, 507 S.W.2d 133, 136 (Tenn. Crim. App. 1973). In any event, the Petitioner has not established that his conviction is void because the record reflects that he was charged with violating a statute that was in effect at the time of his offense. Although the State admitted in the bill of particulars that it could not identify the precise date and time of the abuse that caused the victim's death, Dr. Goodin testified that the fatal blow occurred within thirty-six hours of the victim's death. Tennessee Code Annotated section 39-13-202(a)(4) became effective on July 1, sixty-nine hours before the victim's death. The Petitioner is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE